**Opinion issued June 19, 2025**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-24-00166-CR
_____

**KENTRELL O'BRIEN BRUMFIELD, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 230th District Court**
**Harris County, Texas**
**Trial Court Case No. 1776751**

---

## MEMORANDUM OPINION

Appellant Kentrell O'Brien Brumfield was indicted by a grand jury of first-degree felony murder. He invoked his right to proceed *pro se* and after trial, a jury convicted him of murder and the trial court sentenced him to life in prison. Brumfield's appointed appellate counsel filed a motion for new trial arguing

Brumfield had been denied due process. After conducting a hearing, the trial denied the motion.

In two issues, Brumfield argues he was denied due process because (1) after the trial court granted his request to proceed *pro se*, the trial court failed to give him the required ten-day statutory preparation period under Code of Criminal Procedure Article 1.051(e) before commencing trial, and (2) he was denied access to "significant portions" of discovery prior to trial.

We affirm.

## Background

Appellant Kentrell O'Brien Brumfield and Lioneicia Malveaux were involved romantically. Lioneicia ended the relationship and sought a restraining order against Brumfield claiming he had physically assaulted her and robbed her. Charges for aggravated robbery and assault of a family member were ultimately filed against Brumfield.

On June 29, 2022, Lioneicia and her next-door neighbor and friend, Brittani Simmons, were at Lioneicia's apartment cooking dinner. Brumfield forced his way into the apartment and locked the door behind him. He pulled a gun from his waistband and motioned for Simmons to leave the kitchen and sit on the living room sofa. He shot Simmons while she was sitting on the couch. Simmons ran down the hallway and Brumfield shot her in the back. When the shooting began,

Lioneicia got on her knees and covered her head with her hands. After shooting Simmons, Brumfield shot Lioneicia's legs, foot, and right hand. Brumfield then walked away and closed the apartment door behind him. Lioneicia survived but Simmons died later at the hospital from multiple gunshot wounds.

On the day of the shooting, while Lioneicia was being treated at the hospital, Brumfield called Lioneicia's mother and confessed to the shootings, conceding they were "senseless." Brumfield was arrested after a high-speed chase in Mississippi several days later and indicted for first-degree felony murder. *See* TEX. PENAL CODE § 19.02(b)(1), (c). The indictment stated Brumfield "unlawfully, intentionally and knowingly cause[d] the death of Brittani Simmons . . . by shooting [Simmons] with a deadly weapon, to-wit a firearm." After his arrest, the trial court appointed counsel to represent Brumfield.

## Pretrial Hearings

On July 26, 2023, during a pretrial hearing, Brumfield told the trial court he no longer wanted his appointed counsel to continue representing him and that his family would hire an attorney. The trial court told Brumfield that if he failed to secure a retained attorney by the time of trial, his court-appointed attorney would represent him at trial.

Later, during a pretrial hearing on February 8, 2024, Brumfield told the trial court that his court-appointed counsel was "insufficient." The trial court told

3

Brumfield that while he had the right to a court-appointed attorney, he did not have the right to select that attorney. The court again told Brumfield that if he did not secure a retained attorney by the time trial was scheduled to begin in eight days, he could continue with his appointed counsel or represent himself.

### The *Faretta* Hearing[1]

On February 15, 2024—one day before jury selection began—the trial court conducted a *Faretta* hearing in response to Brumfield's request to represent himself during trial. The trial court asked about Brumfield's educational background and inquired whether he understood the charge against him and the range of punishment. The trial court also discussed with Brumfield the court-appointed attorney who had represented Brumfield up to that point. The court cautioned Brumfield that if he proceeded *pro se*, he would be held to the same

---

[1] The Sixth Amendment of the United States Constitution guarantees both the right to counsel and the corresponding right to self-representation. *See* U.S. CONST. amend. VI; *Faretta v. California*, 422 U.S. 806, 819 (1975); *Hathorn v. State*, 848 S.W.2d 101, 122–23 (Tex. Crim. App. 1992). The Texas Constitution also provides a right of self-representation for criminal defendants. TEX. CONST. art. I, § 10. The defendant who seeks to waive his right to counsel must be competent, and the waiver must be knowing and voluntary. *Godinez v. Moran*, 509 U.S. 389, 400 (1993); *see also Prather v. State*, 238 S.W.3d 399, 403 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) ("The decision to waive counsel and to proceed pro se is made 'knowingly and intelligently' if it is made with a full understanding of the right to counsel that is being abandoned, as well as of the dangers and disadvantages of self-representation. The decision is made voluntarily if it is uncoerced.") (citation omitted). A *Faretta* hearing is intended "to ensure a criminal defendant's decision to waive counsel is made knowingly and intelligently[.]" *Webb v. State*, 36 S.W.3d 164, 177 n.4 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).

standard as an attorney during trial, he would be waiving his right to make an ineffective assistance of counsel argument on appeal, and he would not have standby counsel during trial.[2] The trial court told Brumfield that regardless of whether he opted to represent himself, jury selection would begin the next day.

The trial court found Brumfield was competent to represent himself and it allowed Brumfield to proceed *pro se* at trial. Jury selection began the next day, on February 16, and three days later, on February 19, 2024, a jury was sworn in, opening arguments occurred, and testimony began.

### Trial Testimony

The State presented seven witnesses during the guilt-innocence phase of trial and the defense presented one.[3]

### A.      Detective Brian Norton

Detective Norton was a patrol lieutenant for the Harris County Constable's office on the day of the shooting. He testified about the body camera footage from one of the officers at the scene and about the scene he encountered at the apartment

---

[2]    "A trial court may appoint standby counsel for a defendant who has waived his right to counsel, but the court need not do so, and the court's decision to not appoint standby counsel is not reversible error." *McCain v. State*, No. 02-17-00210-CR, 2018 WL 3059964, at *6 (Tex. App.—Fort Worth June 21, 2018, no pet.) (mem. op., not designated for publication) (citing *Burgess v. State*, 816 S.W.2d 424, 428 n.1 (Tex. Crim. App. 1991)).

[3]    We limit our discussion to testimony relevant to the issue on appeal.

generally. The camera footage was played for the jury. Brumfield did not cross-examine Detective Norton.

**B.   Gary Clayton**

Gary Clayton was a forensic investigator for the Harris County Sheriff's Office when the shooting occurred. He testified that several spent shell casings were found inside the apartment and that the shell casings were all 9-millimeter casings. Brumfield did not cross-examine Clayton.

**C.   Detective Steven Campos**

Harris County Sheriff's Detective Steven Campos testified that based on officers' conversation with Lioneicia and other witnesses on the scene, Brumfield was identified as the suspect in the shooting. According to Detective Campos, at the time of the shooting, Brumfield, Lioneicia, and Simmons were inside the apartment. Brumfield was not at the scene when Detective Campos arrived but he eventually was taken into custody in Mississippi.

Detective Campos testified that firearm casings usually project outward from the weapon, "not too far from the firearm." Based on where the casings were found, he concluded the firearm was shot inside the apartment.

Detective Campos testified that Lioneicia allowed officers to extract information from her phone, which gave them access to her call logs, text

messages, and other information. According to Lioneicia's call logs, Brumfield called Lioneicia seventeen times the day of the shooting.

Detective Campos testified that he read Brumfield his *Miranda* warnings[4] and spoke with him after his arrest. According to Detective Campos, Brumfield never told him that any other men were present at the time of or immediately before the shooting.[5] Detective Campos testified that no other suspects were identified as a result of his interview with Brumfield.

Brumfield cross-examined Detective Campos about his interview of Brumfield after his arrest.[6] Detective Campos testified in response to Brumfield's question that he did not recall who else, if anyone, was in the interview room with him. Detective Campos testified on re-direct that Brumfield told him during his interview that he "pushed his way in" to Lioneicia's apartment after she asked him

---

[4]  In *Miranda v. Arizona*, 384 U.S. 436, 464–65 (1966), the United States Supreme Court addressed "interrogation practices . . . likely . . . to disable [an individual] from making a free and rational choice" about speaking to law enforcement authorities. *Martinez v. State*, 272 S.W.3d 615, 619 n.10 (Tex. Crim. App. 2008). The Supreme Court held in *Miranda* that "an accused, held in custody, must be given the adequate and effective warnings" before questioning commences and that "[t]he failure to give timely warnings generally results in the state being required to forfeit the use of any statement obtained during that interrogation during its case-in-chief." *Id*. (citing *Miranda*, 384 U.S. at 445).

[5]  In his opening statement, Brumfield told the jury that on the night of the shooting, "two guys [were] running up the stairs" behind him as he ran toward Lioneicia's apartment, saying, "we got you now[.]"

[6]  Brumfield asked Detective Campos why no recording of his interview was presented during trial. Brumfield stated, while cross-examining Detective Campos, that he (Brumfield) did not recall the interview.

7

to pick up his belongings from her apartment. According to Detective Campos, Brumfield told him he carried a Smith & Wesson firearm on him. Detective Campos testified that Smith & Wesson firearms fire 9-millimeter caliber bullets.

## D.   Lioneicia Malveaux

Lioneicia testified about her relationship with Brumfield, which began in January 2022. On June 3, 2022, she ended the relationship and a restraining order was filed against Brumfield that same day because he choked her, she "blacked out," and he "pulled a gun" on her. Lioneicia testified that Brumfield continued to "stalk" her through June 29, 2022. She testified that she "had been asking [him] to come and get [his] belongings" from her apartment since June 3, 2022.[7]

On June 7, 2022, Lioneicia told Brumfield she loved him but that they could not be together and that he needed to pick up his belongings from her apartment. On June 21, 2022, she was still trying to get Brumfield to pick up his belongings. She testified, "[H]e called me every day. He texted me every day. I could barely, you know, get my job done at work because he kept calling, kept calling."

On the day of the shooting—June 29, 2022—Lioneicia told Brumfield again to come get his belongings. She left his belongings outside her apartment. He

---

[7]   Lioneicia testified similarly during Brumfield's cross examination of her. During cross-examination, she testified that Brumfield "stalked" her from June 3, 2022, when she first asked him to retrieve his belongings from her apartment, through June 29, 2022. She stated that the protective order was issued because he "chok[ed]" her, and because of an aggravated robbery, when Brumfield "pulled out a gun on [Lioneicia] asking [her] for some money" he had given her.

8

called her and she told him to stop calling, that he was giving her "stalker vibes." Lioneicia told Brumfield she would never be in a relationship with him again, would never marry him, would never have kids with him, and would never get a house with him. Brumfield went to her apartment two or three times that day according to the surveillance camera in Lioneicia's apartment.

Later that same day, Lioneicia was in her apartment with her friend Simmons and they were cooking dinner. Lioneicia went outside to smoke a cigarette and saw Brumfield running up the stairs to her apartment. According to Lioneicia, she ran into her apartment and tried to shut the door but Brumfield put his foot in the door. He asked if they could talk and she said no. She told him to just get his belongings. Lioneicia asked Brumfield to move his foot so she could close the door, but he barged into her apartment and shut and locked the door.

Lioneicia testified that he then "pulled the gun from out of his waistband. And he broke my camera." The camera was on a stand next to the couch and was facing Lioneicia's door so that everything in the living room was visible. "After [Brumfield] broke the camera, he gun motioned [Simmons] to come out of the kitchen and sit down on the couch." Brumfield was pacing and he said, "Oh, bitch, you're going to die today." Brumfield shot Simmons twice while she was on the couch. Simmons ran through the hallway and Brumfield shot her in the back. He

then shot Lioneicia. "And after he shot me, he just walked out the door and closed the door."

Lioneicia called 911, her mother, and her grandmother.[8] She called to Simmons, who said she had "been hit" and thought she was "going to die."

Lioneicia testified that Brumfield shot her in the foot, legs, and hand. She said he "tried to shoot [her] vagina" because he shot her in the legs "right before you get to [her] private area." Lioneicia has rods and pins in her finger and a rod in her right leg as a result of the shooting. Lioneicia testified that Brumfield "always carr[ies] two guns."

During cross-examination, Lioneicia testified there were no other men with Brumfield or chasing him when he barged into her apartment. She testified Brumfield "stood right there in the middle of the living room after [he] already broke the camera and locked my door and cocked [his] gun. After [he] took it out of [his] waistband, [he] gun motioned [Simmons] to sit down on my couch[.]" She said to Brumfield during his cross-examination, "You took Brittani's life for no reason. You shot me for no reason. All because of rejection. I do not want to be with you anymore. I was over you and you could not accept that."

---

8    Lioneicia's 911 call was played for the jury. She did not identify the shooter during the call, but she said a man shot her.

10

### E.    Delicia Malveaux

Delicia is Lioneicia's mother.  She testified that Lioneicia and Simmons were friends and neighbors.  On June 29, 2022, Brumfield called her at least six or seven times looking for Lioneicia.  Lioneicia called her several hours later and told her Brumfield had shot her.  Delicia testified she went to Lioneicia's apartment, where she encountered law enforcement and EMS. She then went to the hospital.

After Delicia arrived at the hospital, Brumfield called her.  Delicia spoke with him briefly and then signaled to the police, who began recording the call.  Delicia asked Brumfield where he was because she "wanted him to actually be arrested for what he had done, all the pain he's caused everybody."  According to Delicia, Brumfield said he "was going to go to war," that he "wasn't going to be going back to jail for 30 or 40 years."  He told her he "barge[d]" his way into Lioneicia's apartment.

The audio of the phone call between Brumfield and Delicia was played for the jury.[9]  During the phone call, Delicia repeatedly asked Brumfield, "What led you [to] shoot her? What led you to shoot them?"  Brumfield did not deny shooting Lioneicia and Simmons in response.  He instead stated, "When I pulled the gun out

---

[9]    Brumfield objected to admission of the call, asking whether it was legal to be recorded without his knowledge.  After the court told him it was, he asked why an earlier conversation with Delicia had not been recorded.  The trial court judge told him he did not know.  Brumfield stated he had no additional objections, and the call was admitted.

11

. . . Brittani was running toward the room . . . And that's when I shot Brittani." Delicia said to him, "You have actually killed Brittani. You killed her." And Brumfield responded, "Yes, ma'am." Brumfield conceded during the phone call with Delicia that his shooting of Simmons and Lioneicia was "senseless" and that he did it because he felt "disrespected."

Delicia testified that no one was with Brumfield the day of the shooting and he never told her that men were approaching him outside Lioneicia's apartment. "Nobody was ever with him. He was by himself. From start to finish, even from the phone calls during that day, nobody was in his—that vehicle with him, but himself. . . . I could hear him talking. No one was with him. Nobody never said anything. All the many times he called me that day, he was by himself."

During cross-examination, Delicia denied Brumfield told her Lioneicia was trying to "set [him] up."

## F.    Dr. Paulyann Maclayton

Dr. Maclayton is an assistant Harris County medical examiner. She reviewed a report of Simmons' autopsy. During the autopsy, the medical examiner found four gunshot wounds. The first one was a "penetrating gunshot wound of the torso." The entrance wound was on Simmons' back and the shot was made "maybe more than two feet away" from Simmons. She described Simmons' internal injuries from the gunshot, which could have resulted in her death. Dr.

12

Maclayton testified that the medical examiner determined based on the direction of the bullet and its trajectory that Simmons was facing away from the shooter.

Dr. Maclayton described a second gunshot wound, which perforated Simmons' left forearm. There also were two penetrating gunshot wounds to her left and right thighs. The autopsy concluded there was "some distance" between the shooter and Simmons. The jury was shown autopsy photos. Dr. Maclayton testified that Simmons' cause of death was "multiple gunshot wounds."

On cross-examination, Maclayton conceded she could not tell whether all four gunshot wounds came from the same gun.

## G.    Kentrell Brumfield

Brumfield testified on his own behalf and was the only defense witness. He testified that Simmons was shot four times. He testified that on the night of June 29, 2022, Lioneicia texted him to retrieve his belongings from her apartment. He did not proffer any additional testimony.

During cross-examination Brumfield testified that he shot Simmons because she "came at" him "with something in her hand" when he arrived at the apartment. He said the camera in the apartment was broken and had always been broken. He conceded that when he spoke with Delicia about the shootings, he did not mention other men. He testified that he admitted to Delicia that he shot Lioneicia and

13

Simmons and that the shootings were "senseless." The following exchange transpired during his cross-examination:

The State: Okay. And what did you do with you gun?

Brumfield: What you mean, what I do with my gun?

The State: What did you do with the gun that you shot—

Brumfield: I don't—

The State: —shot Brittani with?

Brumfield: I don't know where the gun at.

Ya'll have it in evidence?

The State: You don't know what you did with the gun?

Brumfield: I don't know where the gun at.

The State: Did you stay and call police after you shot them?

Brumfield: No, ma'am.

The State: Did you try to render any aid after you shot—

Brumfield: No, ma'am.

The State: —Brittani and Lioneicia?

Brumfield: No, ma'am.

After testimony concluded and the parties closed, the jury returned a verdict of guilty. After the punishment phase of trial, the trial court imposed a sentence of life in prison.

14

## The Motion for New Trial

Following his conviction, Brumfield's appointed appellate counsel filed a motion for new trial arguing Brumfield was denied due process because he was not given his statutory right under Article 1.051(e) of the Code of Criminal Procedure to ten days' notice before a dispositive setting and because he was not afforded a "meaningful opportunity to conduct or review discovery" before trial. Brumfield argued he was deprived of his "statutorily-mandated notice, [and] the constitutional right to due process as well."

Brumfield argued he was never afforded the opportunity to access "any of the critical audio and video introduced into evidence" during trial, such as the 911 calls, the law enforcement body camera video, and his phone conversation with Delicia. He claimed he also was unable to access "any of the other 41 videos made part of the discovery in this case, the other 4 emergency services calls, the recording of the interview between investigators and Kentrell Brumfield, the MDT records, the crime scene investigator's video, or the hospital records for Brittani Simmons and Lioneicia Malveaux." Finally, he complained of the State's failure to produce the firearms report, which "indicated that the bullets and bullet fragments in this case could not be identified or eliminated as having been fired from the same firearm." He argued that the inconclusive results of the firearms report could support his "theory of defense that unknown, armed attackers were in

pursuit or could be used as impeachment evidence to raise doubt" that he fired the bullets that caused Simmons' death.

Brumfield attached his declaration and the firearms report from the Harris County Institute of Forensic Sciences to his motion for new trial. In his declaration, Brumfield stated that after he was permitted to represent himself at trial, he asked the court for additional time to prepare for trial[10] but his request was denied. He was given access to "police reports, crime scene photos, crime scene diagrams, medical records, information related to [his] other cases, and text messages from Lionicia [sic] Malveaux's phone." He argued that while he was given autopsy photos, he only had access to them in the courtroom, and he was given a thumb drive "but was not allowed to inspect it at any time" because it was considered "contraband" in the Harris County jail. He argued that because he could not access the thumb drive, he did not have access to the audio or video evidence played at trial, including the two 911 calls, the recording of his phone conversation with Delicia, and the crime scene video.[11]

Brumfield testified during the hearing on the motion for new trial. He testified that to prepare for trial, he was given a flash drive he could not access and

---

[10] During the *Faretta* hearing, the trial court told Brumfield, "If you represent yourself, you will be picking that jury tomorrow." Brumfield responded, "Yes, sir, I understand." Brumfield did not ask the trial court for additional time to prepare during the *Faretta* hearing.

[11] The record does not indicate whether the State filed a response to the motion for new trial.

a number of other materials to review.[12]  According to Brumfield, given his inability to access the flash drive, he did not have access to the four multimedia exhibits offered at trial: the two 911 calls, the law enforcement body camera video, and his phone call with Delicia.  In addition, he testified he did not have access to the interrogation video, some thirty-seven hours of video associated with the case, the crime scene video, the complete 911 records, the Celebrite[13] extraction, the witness meeting notes involving Delicia, or the calls made to victim advocates.

Brumfield also testified he did not have time to review the evidence he was given prior to trial.  Had he received additional time to prepare, he "would know how to present [his] defense with representing [himself] in the trial."  Brumfield argued he would have requested video from the apartment complex and he would have had "the investigator go out and see—you know, go over the scene and tell me more about the situation."[14]

---

[12]     Brumfield testified that he was provided with offense reports, crime scene photos, the autopsy report, some Facebook records, Instagram records, information about his Louisiana convictions, EMS records, a Mississippi offense report, a scene diagram, autopsy reports, and records from a Cellebrite report.  Cellebrite is software used to extract data from a cell phone. *See generally Wright v. State*, 618 S.W.3d 887, 890 (Tex. App.—Fort Worth 2021, no pet.); *Pena v. State*, No. 14-22-00941-CR, ___ S.W.3d ___, 2024 WL 5081673, at *3 (Tex. App.—Houston [14th Dist.] Dec. 12, 2024, no pet.).

[13]     *See Pena*, 2024 WL 5081673, at *3 (identifying Cellebrite as software used to extract data from cell phones).

[14]     We note that any investigator who went to the scene at that point would have visited the murder scene nearly two years after the shooting occurred.

The State asked Brumfield whether he recalled being told there was no apartment complex surveillance video. Brumfield did not recall what evidence he reviewed with his appointed counsel or counsel's investigator. He did not recall "what was said too much at trial" and did not recall testifying during trial that he shot Simmons. According to the State, Brumfield's court-appointed counsel or his investigators visited Brumfield "at least 13 times" and had Zoom calls with him prior to trial.

Brumfield proffered seven exhibits during the hearing on his motion for new trial: his declaration, the Harris County policy on contraband; a printout that lists the discovery available in the case; a summary of the evidence provided to Brumfield, the evidence that was on the USB drive, and the evidence that was on the list but not part of the USB drive or printed for him; the USB drive that Brumfield could not access; autopsy photos made available to Brumfield at trial but that he could not bring back to the jail to review after trial; and the firearm report from the Harris County Institute of Forensic Sciences.

The State called a single witness: Bryan Savoy, Brumfield's appointed counsel until the *Faretta* hearing. Savoy testified that he represented Brumfield for about eighteen months. During that time, he believed he or his investigators visited Brumfield or had Zoom conferences with him "in excess of a dozen times." According to Savoy, he goes over "each and every piece of relevant evidence"

18

with each client and he "see[s] no reason that [he] deviated from that in this case." He testified that he and Brumfield went over the 911 calls and the recorded call with Delicia. Savoy testified that after learning which evidence the State planned to introduce and the witnesses expected to be called during trial, he or his investigator went to the jail and went over that information with Brumfield. He recalled going over the firearms report and its inconclusive results with Brumfield. There was discussion of when the firearms report was released to the defense and whether it was available to him during trial.[15] Savoy testified that he and Brumfield "reviewed all pertinent evidence" before Brumfield proceeded *pro se.*

Brumfield's appellate counsel argued that a *pro se* defendant is "not required to rely on their memory of it that they may have reviewed at some point in the past . . . [W]hen a person was representing themselves, it is a completely different way that they're looking at the evidence than if they are reviewing it with their lawyer with the expectation that the lawyer is going to take care of their legal interest." According to Brumfield's appellate counsel, there was "no record whatsoever" that Brumfield was given the firearms report, which "would have been a cornerstone to his defense." In addition, he argued, "He just didn't have enough time from the point the determination was made that he represent himself to the point that he was basically thrust into trial to really kind of marshal evidence." Brumfield's counsel

_____

[15] Savoy testified that firearms reports are available through the DEEDS database in the district clerk's office.

19

further argued that under Article 39.14 of the Texas Code of Criminal Procedure, Brumfield was entitled to review discovery, and that under Article 1.051(e), he should have been given ten days to do it: "[L]ooked at together, 39.14(d) is an essential part of the right to self—pro se representation process. The 10 days are an essential part of 1.051(e). And those were triggered at that specific time."

The State argued that Brumfield had been in custody since July 5, 2022, there were numerous hearings before trial, and "none of those times did the defendant unequivocally assert his right to represent himself." The case originally was set for trial in September 2023, and it was later reset to February 2024. Although he filed documents on his own asking to dismiss appointed counsel and get new appointed counsel, it was not until February 2024—when Brumfield "finally, unequivocally, asserted his right to represent himself"—that the *Faretta* hearing was held. The State argued that Brumfield had not preserved his right to appeal the State's failure to produce evidence because he did not ask for a computer to review evidence after the *Faretta* hearing.

Finally, the State argued that while the firearms report "may not have been disclosed" after the *Faretta* hearing, "it was clear from the record and from Mr. Savoy's testimony that the firearms report was reviewed with Mr. Brumfield. [And t]hose results were inconclusive." In addition, the State argued, Brumfield admitted during trial that he shot Simmons. Thus, the State argued, "the results

20

would not have materially changed from this inconclusive firearms report."

The trial court denied Brumfield's motion for new trial without elaboration. This appeal ensued.

## Waiver

In his first issue, Brumfield argues that he was denied due process because, after the trial court granted his request to proceed *pro se*, the trial court failed to give him the required ten-day statutory preparation period under Code of Criminal Procedure Article 1.051(e) before commencing trial.

The State argues that Brumfield failed to preserve his complaint under Article 1.051(e) because he did not move for a continuance of the trial date. Brumfield correctly notes that the Court of Criminal Appeals has rejected this argument:

> In the instant cause, the Court of Appeals rightly determined that article 1.051(e) is waivable only, inasmuch as the Legislature said so expressly by providing that appointed counsel "may waive the [10 days of] preparation time with the consent of the defendant in writing or on the record in open court." We agree with the lower court that this language clearly does not contemplate a forfeiture of the statutory right from a mere failure to object at trial.

*Marin v. State*, 851 S.W.2d 275, 280 (Tex. Crim. App. 1993), *overruled on other grounds by Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997)); *see also Ashcraft v. State*, 900 S.W.2d 817, 829 (Tex. App.—Corpus Christi–Edinburg 1995, pet. ref'd) ("The failure to comply with article 1.051(e) may be raised for the

first time on appeal."); *Ponce v. State*, 89 S.W.3d 110, 115 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.) (same).

We hold Brumfield preserved his right to complain on appeal about the trial court's alleged failure to adhere to the ten-day notice provision in Article 1.051(e).

### Application of Article 1.051(e) to a *Pro Se* Defendant

Brumfield argues that under Article 1.051(e), he was entitled to ten days' notice before jury selection began on February 15, 2024. He argues the trial court's failure to allow him the ten-day period violated his due process rights thus constituting reversible error.

Article 1.051(e) provides in pertinent part:

> If an indigent defendant who has refused appointed counsel in order to retain private counsel appears without counsel after having been given an opportunity to retain counsel, the court, after giving the defendant a reasonable opportunity to request appointment of counsel or, *if the defendant elects not to request appointment of counsel, after obtaining a waiver of the right to counsel pursuant to Subsections (f) and (g), may proceed with the matter on 10 days' notice to the defendant of a dispositive setting.*

TEX. CODE CRIM. PROC. art. 1.051(e) (emphasis added). Brumfield relies on the last sentence of this provision to argue that because "only one day elapsed between the date [he] was granted leave to proceed *pro se* and the date [he] began picking a jury in the case," the trial court violated Article 1.051(e).

The State responds that Article 1.051(e) by its express terms applies to only three types of defendants: (1) an indigent defendant with appointed counsel; (2) a

22

nonindigent defendant who appears without counsel at a proceeding after having been given a reasonable opportunity to retain counsel; and (3) an indigent defendant who appears without counsel after refusing appointed counsel in order to retain private counsel. *See* TEX. CODE CRIM. PROC. art. 1.051(e)). Brumfield, the State argues, does not fall into any of these categories. He was thus not entitled to ten days' notice before jury selection began.

The State also relies on three cases holding that *pro se* defendants are not entitled to rely on Article 1.051(e). *See Roberson v. State*, 879 S.W.2d 250, 253 (Tex. App.—Dallas 1994, no pet.) (holding "Article 1.051(e) applies only to court-appointed counsel"); *Lacy v. State,* No. 03–00–00699–CR, 2001 WL 1298821, *2 (Tex. App.–Austin Oct. 25, 2001, no pet.) (not designated for publication) (holding "Article 1.051(e) does not grant a preparation period to a defendant who elects to represent himself[.]"); *Gibson v. State*, No. 01-96-00011-CR, 1996 WL 641145, at *2 (Tex. App.—Houston [1st Dist.] Nov. 7, 1996, no pet.) (not designated for publication) (holding "[A]rticle 1.051(e) does not apply when a defendant elects to represent himself."). As Brumfield correctly points out, however, all three cases were decided under a previous version of Article 1.051(e). That prior version did not include language concerning a defendant's election not to request counsel. As such, they are inapplicable here.

Notwithstanding, it is unclear at first blush whether Article 1.051(e) is applicable to an indigent defendant who is represented by appointed counsel until the eve of trial at which time he requests to proceed *pro se*.[16] This appears to be an issue of first impression, but one we need not decide today. Even if we assume that Article 1.051(e) applies to the present circumstances and that the trial court erred in commencing trial without providing Brumfield ten days to prepare, we conclude the error was harmless.

**Harm Analysis**

Article 1.051(e) is legislative and not a structural constitutional requirement. It is thus subject to a harmless error analysis under Rule 44.2(b). *Rivera v. State*, 123 S.W.3d 21, 32 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (holding that even though trial court violated Article 1.051(e) by giving counsel nine days instead of ten to prepare for pre-sentence investigation hearing, error was harmless under Rule 44.2(b) because one additional day would not have affected appellant's defense or outcome of sentencing hearing) (citing *Matchett v. State*, 941 S.W.2d 922, 928–29 (Tex. Crim. App. 1996)); *Cain v. State*, 947 S.W.2d 262, 264 (Tex.

---

[16] Brumfield argues that the trial court was aware of "simmering tensions" between him and his appointed counsel. While that may be true, none of the correspondence in the record from Brumfield to the trial court reflect that Brumfield requested he be allowed to represent himself prior to the *Faretta* hearing. Rather, Brumfield's handwritten correspondence in the record comprised requests for his bond to be lowered so his family could retain counsel and, alternatively, for new counsel to be appointed to represent him at trial.

Crim. App. 1997) (holding that "[e]xcept for certain federal constitutional errors labeled by the United States Supreme Court as 'structural,' no error . . . is categorically immune to a harmless error analysis").

When applying Rule 44.2(b), we disregard the error unless it affected the appellant's substantial rights. TEX. R. APP. P. 44.2(b) ("Any other error, defect irregularity, or variance that does not affect substantial rights must be disregarded."); *see also King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 271 (citing *Kotteakos v. U.S.*, 328 U.S. 750, 776 (1946)). Substantial rights are not affected "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (quoting *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001)); *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021). Moreover, though not dispositive, "evidence of the defendant's guilt is a factor to be considered in any thorough harm analysis." *Motilla*, 78 S.W.3d. at 358.

Brumfield argues he was harmed by the trial court's error under Article 1.051(e) in three ways: (1) he had "artificially limited access" to discovery before trial commenced; (2) he had insufficient time to conduct an independent

25

investigation or issue compulsory process; and (3) he was impaired in his ability to organize a defense.[17]  We address each argument in turn.

## A.    Access to Discovery

Brumfield argues that after the *Faretta* hearing, he was given only "a limited subset of the discovery in the case" and he was not permitted to inspect the videos, listen to the audio, or access other discovery.  Because this argument is duplicative of his third argument concerning organization of a defense strategy and his second appellate issue, we address this argument in our discussion of Brumfield's second appellate issue.

## B.    Conduct of Independent Investigation

Brumfield argues that had he been afforded ten days' notice before trial commenced, he would have issued subpoenas "for surveillance video" from the

---

[17]    Because the *Faretta* hearing was held on February 15, 2024, ten days' notice would have allowed trial to commence on February 25, 2024.  The State construes Brumfield's argument as complaining of the failure of the trial court to provide an additional six days before trial began, using the reasoning that trial began with opening statements on February 19, 2024.  Trial begins with voir dire, however, which commenced on February 16, 2024.  Brumfield thus contends he was entitled to an additional nine days.  *See generally McCoy v. Wal-Mart Stores, Inc.*, 59 S.W.3d 793, 801 (Tex. App.—Texarkana 2001, no pet.) ("We recognize that voir dire questioning is possibly the most important part of any jury trial[.]"); *Guerra v. State*, 771 S.W.2d 453, 467 (Tex. Crim. App. 1988) (noting trial court's ability to restrict voir dire, which "can become the lengthiest part of a criminal proceeding"); *Adanandus v. State*, 866 S.W.2d 210, 217 (Tex. Crim. App. 1993) (noting Article 33.03 of Code of Criminal Procedure "provides that a defendant must be present during trial and may not voluntarily absent himself until after voir dire"); *compare with Ramirez v. State*, 611 S.W.3d 645, 649 n.2 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd) ("Generally, a criminal trial on the merits begins when the jury is impaneled and sworn.").

apartment complex where the shooting occurred, and that even if the videos "never or no longer existed, [he] could have obtained admissible evidence that there were no existing surveillance records in the case." Brumfield further argued that he did not have time to "secure the attendance of Maleah Stafford[18] and Laquasha Brumfield"[19] to testify. Finally, he argues that with additional time, he "could have obtained the firearms report, which provides some level of support to his theory that multiple shooters could have been involved" in Simmons' death.

The State notes that when asked during the hearing on his motion for new trial, Brumfield was unable to explain how he would have proceeded with the extra days. He generally stated that if he had been afforded additional time, he would "know how to present [his] defense," he would have asked the investigator to "go out and see . . . go over the scene," and he would have "basically, like I said, you know, had time to present the defense that I had." The State argues that the apartment complex surveillance video Brumfield sought did not exist and that the trial court reasonably concluded that "evidence of the absence of evidence would not have impacted the jury's verdict." The State argues this is particularly true "given the compelling testimony of the surviving victim describing how appellant forced his way into the apartment and repeatedly shot Simmons as she attempted to

---

[18]    Stafford was subpoenaed as a witness but did not appear at trial.

[19]    The record does not identify Laquasha Brumfield's relation, if any, to Brumfield or explain her connection to the case.

27

flee" and in light of Brumfield's confession during his recorded telephone conversation with Lioneicia's mother Delicia.

The State notes that Brumfield does not explain how the testimony of Stafford[20] or Laquasha Brumfield would have helped his defense. Finally, the State argues the firearms report would not have helped Brumfield's defense, given that the report "reflects that all of the fired Blazer brand 9mm Luger cartridge cases submitted for examination were filed from the *same* firearm." (Emphasis in original.) The State further argues that the report's inconclusive portions do not support Brumfield's theory that multiple shooters were involved, thus they would not have changed the outcome of the case. In any event, the State avers Savoy testified that he reviewed the ballistics report with Brumfield during his representation.

We conclude that Brumfield's arguments concerning his alleged inability to conduct a more thorough investigation are unavailing. Brumfield's failure to explain the significance of the purported surveillance video, or lack thereof, leaves us with no basis for determining whether it would have affected the outcome of the trial. Brumfield also fails to explain how Stafford's or Laquasha Brumfield's

---

[20]    Stafford, who was Lioneicia's other next-door neighbor, made a 911 call after hearing gunshots from Lioneicia's apartment on June 29, 2022. The jury listened to the call, which was admitted without objection from Brumfield. During the call, Stafford told the operator she saw a man outside her neighbor's apartment and that her neighbor did not want to let the man in.

28

testimony would have helped his defense. We further note that while Stafford was subpoenaed as a witness, she did not appear at trial. And there is no indication that postponing the trial nine additional days to give Brumfield a full ten days before trial commenced would have resulted in her appearance at trial. Finally, the only portion of the firearms report that does not affirmatively point to a single shooter is an inconclusive portion that does not necessarily cast doubt on the State's theory, especially given the evidence proffered and testimony elicited at trial indicating Brumfield acted alone in shooting Simmons.

## C.     Organization of a Defense Strategy

Brumfield also argues that had he been afforded a full ten days before trial commenced, he "would have had a more reasonable opportunity to become personally acquainted with the substantial amount of discovery in the case." He further avers that the short timeline resulted in his deficient direct examination because he "had no cohesive theory of the case and was not able to formulate a series of questions and answers on the spot."

The State responds that, given Brumfield's lack of legal training and education, his self-professed unfamiliarity with the Texas Penal Code, the Texas Code of Criminal Procedure, and the Texas Rules of Evidence, and the "overwhelming" evidence of his guilt, the additional days of preparation time would not likely have enabled him to develop a "convincing legal strategy." The

State thus argues that any error in the denial of nine days of additional preparation time did not affect Brumfield's substantial rights.

We agree. In conducting our harmless error analysis, we do not focus on the propriety of the outcome of trial, but instead consider "whether the error had a substantial or injurious effect or influence on the jury's verdict." *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011) (citing *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000)). In our harm analysis, we consider

> (1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the error.

*Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018) (citing *Motilla*, 78 S.W.3d at 356–58). We consider everything in the record and may consider the jury instructions, the parties' theories of the case, and closing arguments. *Motilla*, 78 S.W.3d at 355–56. We are also charged with considering "evidence of the defendant's guilt" in our harm analysis. *Id.* at 358.

We have already touched upon the first factor. Brumfield does not explain how securing the attendance of Stafford or Laquasha Brumfield or testimony about the absence of an outdoor surveillance video would have bolstered his case. Nor does he elaborate on the defense he would have advanced had he been afforded additional time to prepare. As for the firearms report, he contends it would have

provided "some level of support to his theory that multiple shooters could have been involved" in Simmons' death. But Brumfield testified on his own behalf and never alluded to other people firing shots at Lioneicia or at Simmons resulting in her death.[21] In any event, it is unlikely the firearms report would have advanced Brumfield's argument. The firearms report indicates the spent cartridge cases were fired from the same gun, but that a bullet fragment and two fired bullets could not be identified or eliminated as having been fired from the same gun, although they had "similar class characteristics."

With respect to the second and third factors,[22] the evidence and testimony elicited at trial in support of Brumfield's conviction was overwhelming. For example:

- Brumfield testified that it was his voice heard in State Exhibit 38 (his telephone conversation with Delicia Malveaux).

- Brumfield told Delicia during the call, "When I pulled the gun out . . . Brittani was running toward the room . . . And that's when I shot Brittani."

- Delicia said to him, 'You have actually killed Brittani. You killed her." And Brumfield responded, "Yes, ma'am."

---

[21]   Indeed, Brumfield's appellate brief states in its statement of facts, "Claiming that Brittani Simmons came at him with something in her hand, Kentrell Brumfield shot and killed Brittani Simmons and shot Lioneicia Malveaux several times."

[22]   The fourth factor is inapplicable under these circumstances. The State did not emphasize the absence of any evidence that Brumfield asserts he could have proffered, as Brumfield actually confessed to the killing.

- Delicia repeatedly asked, "What led you shoot her? What led you to shoot them?" Brumfield did not deny shooting Lioneicia and Simmons in response.

- Brumfield conceded during the phone call with Delicia that his shooting Simmons and Lioneicia was "senseless" and that it occurred because he felt "disrespected."

- Brumfield testified on cross-examination that he shot Simmons because she "came at" him with "something in her hand" when he "came in the door." But Lioneicia testified that he shot Simmons twice while she was sitting on the couch and then again in the back as she ran through the hallway; the medical examiner testified Simmons had been shot in the front of each thigh, once in the foreman, and once in the back. And Brumfield said during the phone call with Delicia that Simmons was running toward the bedroom when he shot her.

- Brumfield did not deny having shot Simmons and Lioneicia during cross-examination when the State asked whether he called the police "after [he] shot them," and whether he stayed and rendered aid after he "shot [Simmons] and Lioneicia."

- Brumfield testified he did know where the gun with which he shot Simmons was. "I don't know where the gun at."

- Lioneicia testified that Brumfield "barged" into her apartment after she tried to prevent him from entering, locked the door, pulled a gun from his waistband, said "Oh, bitch, you're going to die today," shot Simmons and then shot her (Lioneicia). Lioneicia's account of Brumfield's entry into her apartment was corroborated by Stafford's 911 call, made immediately after Stafford heard the gunshots.

- Brumfield was apprehended after leading the Mississippi Highway Patrol on a high-speed chase, opening fire at law enforcement officers at the conclusion of the chase.

- During his closing, Brumfield said he was "fully [sic] remorse about [Simmons]."[23]

Reviewing the record as a whole, as we must, we conclude that even if the trial court erred in not giving Brumfield ten days to prepare for trial, the error was harmless. We overrule Brumfield's first issue.

## Discovery and Article 39.14

In his second issue, Brumfield argues he was denied access to discovery in violation of his right to due process and in violation of Article 39.14(d) of the Texas Code of Criminal Procedure. The State argues that Brumfield failed to preserve this issue for appeal, and any error was harmless.

Article 39.14 of the Texas Code of Criminal Procedure provides in pertinent part:

(a) . . . [A]s soon as practicable after receiving a timely request from the defendant the state shall produce and permit the inspection and the electronic duplication, copying, and photographing, by or on behalf of the defendant, of any offense reports, any designated documents, papers, written or recorded statements of the defendant or a witness, including witness statements of law enforcement officers but not including the work product of counsel for the state in the case and their investigators and their notes or report, or any designated books, accounts, letters, photographs, or objects or other tangible things not otherwise privileged that constitute or contain

---

[23] Although closing arguments are not evidence, we cite them because we consider the entire record in our harm analysis. *See Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002) ("The reviewing court may [] consider the jury instructions, the State's theory and any defensive theories, closing arguments and even voir dire, if applicable").

evidence material to any matter involved in the action and that are in the possession, custody, or control of the state or any person under contract with the state. . . .

. . .

(d)     In the case of a pro se defendant, if the court orders the state to produce and permit the inspection of a document, item, or information under this subsection, the state shall permit the pro se defendant to inspect and review the document, item, or information but is not required to allow electronic duplication as described by Subsection (a).

. . .

(h)     Notwithstanding any other provision of this article, the state shall disclose to the defendant any exculpatory, impeachment, or mitigating document, item, or information in the possession, custody, or control of the state that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged.

TEX. CODE CRIM. PROC. art. 39.14.

On appeal, Brumfield argues "three independent problems . . . obstructed [his] right to meaningful discovery." First, he was not given a computer and permitted to review discovery in court; second, he was not given access to the USB drive provided to him by appointed counsel after his withdrawal from the case; and third, a "substantial portion" of evidence available to Brumfield on the Harris County District Attorney's portal was not printed for him or included on the USB drive given to him.

Before trial began, Brumfield complained he had not received all of the evidence:

> So I'm not going to have everything I need. Because guess why? I'm incarcerated. I can't go to the apartment complex and get no audio or get the surveillance. I cannot go here to do this and do none of that. I'm incarcerated. How can I get this?
>
> . . .
>
> A lot of things have been missing. I'm sorry. I don't even know— don't want to cause no conflict or nothing. But I'm just saying, like, this the things that was going on that wasn't brought to your attention. There were different things that were brought to my attention that it wasn't beneficial for me to—to have the evidence I need. I'm not no lawyer. I'm not no—I'm not no investigator to go out to do these things.

Brumfield complained that he did not have surveillance video from outside the apartment. The State responded there was no surveillance video from outside the apartment. Brumfield told the trial court he saw "one or two [other] surveillance [videos]" but if there were other videos or audio, they were not provided to him.

The trial court gave Brumfield an opportunity to present pretrial motions before trial commenced:

The Court: Mr. Brumfield, do you have any pretrial motions?

Brumfield: Pretrial motions? Can you, uh—

The Court: Any pretrial motions we need to take up at this time? Anything at all?

Brumfield: Yes, sir.

35

I—I sent the motions that—you know, that I sent it to you and the DA and to whoever I need to sent them to. None of them got granted.

So at this moment, I would just—I would just want all the evidence. That's what I want.

The Court: You have all of the State's evidence in front of you.

Is there any motions that you would like me to look at that you filed at any time at this time?

Brumfield: I've been—I've been—well, I got—that's what I wanted.

The Court: Anything?

Brumfield: I have—have to find them. That's what I needed to do.

The Court: All right. While you're looking, we're going to go ahead and get started. We don't—we don't have all day.

Brumfield did not ask for a continuance to allow him time to review any late-produced or missing discovery.[24] Thus, to the extent the State violated Article 39.14—which we need not decide today—such error was not preserved for appeal. *See Rodriguez v. State*, 630 S.W.3d 522, 524 (Tex. App.—Waco 2021, no pet.) (holding defendant waived complaint of Article 39.14(a) violation by failing to request continuance when State disclosed document for first time on first day of trial) (citing *Lindley v. State*, 635 S.W.2d 541, 544 (Tex. Crim. App. 1982) ("The failure to request a postponement or seek a continuance waives any error urged in

---

[24] Nor did Brumfield ask the trial court before any of the three audio recordings or one video recordings were played for the court for an opportunity to review them before they were published to the jury.

36

an appeal on the basis of surprise.”)); *Prince v. State*, 499 S.W.3d 116, 121 (Tex. App.—San Antonio 2016, no pet.) (“By failing to file a sworn, written motion for continuance, Prince failed to preserve error on . . . any alleged discovery violation.”); *Humphries v. State*, No. 11-22-00271-CR, 2024 WL 3528959, at *4 n.4 (Tex. App.—Eastland July 25, 2024, no pet.) (mem. op., not designated for publication) (“[A] defendant’s failure to request a continuance [] waives any violation under Article 39.14(h).”) (citing cases).

### Harm Analysis

Even if Brumfield’s discovery argument had been preserved for our review, he would not prevail. “[W]hen only a statutory violation is claimed, the error must be treated as non-constitutional for the purpose of conducting a harm analysis[.]” *Gray v. State*, 159 S.W.3d 95, 98 (Tex. Crim. App. 2005); *Branum v. State*, 535 S.W.3d 217, 226 (Tex. App.—Fort Worth 2017, no pet.) (applying Rule 44.2(b) harm analysis to Article 39.14 violation); *Fortuna v. State*, 665 S.W.3d 861, 869 (Tex. App.—Houston [14th Dist.] 2023, no pet.) (same). As noted, we review the entire record when analyzing harm under Rule 44.2(b) to determine whether the error substantially influenced the verdict. *Motilla*, 78 S.W.3d at 355; *McGowen v. State*, 25 S.W.3d 741, 745 (Tex. App.—Houston [14th Dist.] 2000, pet. ref’d).

Brumfield argues on appeal that his “theory of defense was Lioneicia Malveaux [sic] was shot by another person’s bullet” and thus, the firearms report,

which was not on the portal or the USB drive, "may have supported [his] theory of defense, at least raising the inference that there would have been multiple shooters in the case, consistent with [his] theory of ambush."[25] While that may be his defense now, Brumfield did not testify about that defense during trial. Rather, Brumfield stated in his opening statement[26] that two "guys [were] running up the stairs" behind him, saying, "we got you now," but he never argued that either man was brandishing a weapon or that either entered Lioneicia's apartment, and he never referred to the men during his testimony. Brumfield said in his opening that Simmons "lost her life because of—because—okay, if you want to say me, but because of another situation that put her life in danger. Put my life in danger for me to—cause me to react." And while he alluded in his opening to being "put in a situation" where he had to "protect [him]self," he unequivocally testified that he shot Simmons because she "came at" him "with something in her hand" when he arrived at the apartment. He conceded during his testimony that when he spoke with Delicia during the recorded phone call about the shootings, he did not

---

[25] The jury charge did not contain a self-defense instruction and Brumfield does not complain on appeal that there should have been such an instruction.

[26] The arguments of counsel are not evidence. *See Weslaco Fed'n of Teachers v. Tex. Educ. Agency*, 27 S.W.3d 258, 263 (Tex. App.—Austin 2000, no pet.) (noting opening argument is not evidence); *Freeman v. State*, 340 S.W.3d 717, 728–29 (Tex. Crim. App. 2011) (noting counsel "may not use closing arguments to present evidence that is outside the record").

mention men chasing him. Nor did Brumfield mention any other men to Detective Campos during their post-arrest interview.

Further, as set forth in our harm analysis above, Brumfield conceded more than once during his recorded phone call with Delicia that he shot Simmons. He stated he did it because he felt "disrespected," and he acknowledged the shooting was "senseless." He never denied shooting Simmons during his testimony or his cross-examination during trial, or even on appeal.[27] And he said he was remorseful about the shooting during his closing argument. Reviewing the record as a whole, we conclude that even if the trial court violated Article 39.14, the error was harmless.

We overrule Brumfield's second issue.

## Conclusion

We affirm the trial court's judgment.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.

Do not publish. TEX. R. APP. P. 47.2(b).

---

[27] *See supra,* note 21.